**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MISSOURI**

**EASTERN DIVISION**

| | |
|---|---|
| CYNTHIA EARLY, on behalf of herself and all others similarly situated, | CASE NO._____ |
| Plaintiff, | |
| v. | **JURY TRIAL DEMANDED** |
| HENRY THAYER COMPANY, INC. | |
| Defendant. | |

## CLASS ACTION COMPLAINT

Plaintiff Cynthia Early brings this action on behalf of herself and all others similarly situated against Defendant Henry Thayer Company. Plaintiff makes the following allegations pursuant to the investigation of counsel and based upon information and belief, except as to the allegations specifically pertaining to herself, which are based on personal knowledge.

## NATURE OF THE ACTION

1.      In an attempt to capitalize on consumer demand for health-focused and "natural" personal care products, Defendant sells its "THAYERS® Natural Remedies" brand of products through major retailers around the country as well as its own e-commerce store. However, as Defendant knows, the vast majority of its "natural" products contain synthetic and abrasive chemical ingredients. Thus, the many statements on Defendant's products' labels claiming that the products are "natural," including the name of the product line – THAYERS® Natural

Remedies – are false, misleading, and designed to deceive consumers into paying a price premium and choosing THAYERS® Natural Remedies over a competitor's product.

2.      This action seeks to remedy the deceptive and misleading business practices of Defendant with respect to its marketing and sales of the following THAYERS® Natural Remedies products (hereinafter "Products") throughout the State of Missouri and the United States of America.[1]

3.      Defendant's THAYERS® Natural Remedies brand created and continues to maintain a "natural" myth that is displayed prominently on all of its Products' labels as well as throughout its website and social media accounts to promote and advertise the Products as "natural remedies." For example, the History page on the Thayers Natural Remedies website describes the company: "A legacy brand, Thayers **natural elixirs** have been a fixture in medicine cabinets for generations – for 170 years to be exact. Through a long-standing commitment to creating **pure**, effective, cruelty-free products of the **highest natural quality**, we have built a loyal consumer base."  (emphasis added).

4.       Building upon this deception by labeling and advertising the Products as "Natural Remedies," Defendant creates the impression amongst reasonable consumers that the Products are natural. However, Defendant fails to adequately inform consumers that the Products contain numerous synthetic, unnatural, and dangerous ingredients. Indeed, Defendant only lists the synthetic, unnatural ingredients in the Products on the back of the Product packaging in small, hard-to-read print and, even then, fails to inform consumers that many of the ingredients listed are synthetic and unnatural. Consumers are not experts in the chemical make-up or names of the ingredients disclosed in fine print on the back of the labels and, based on the "natural"

---

[1] A full list of the Products defined in this action is contained in Exhibit A.

representations headlining the Products' labeling, reasonably believe that the Products contain only natural ingredients.

5.      Additionally, for a period of time, Defendant failed to properly disclose all of the synthetic ingredients present in its Products.

6.      Defendant manufactures, sells, and distributes the Products using a marketing and advertising campaign focused on claims that appeal to health-conscious consumers, i.e. that its Products are "natural."

7.      These representations lead consumers to believe that the Products contain natural ingredients. However, Defendant's advertising and marketing campaign is false, deceptive, and misleading because the Products contain synthetic ingredients.

8.      Plaintiff and those similarly situated ("Class Members") relied on Defendant's misrepresentations that the Products are "Natural" when purchasing the Products.

9.      These deceptive "Natural" representations appear prominently on the Products' label. For example, on the principal display panel of all of Defendant's Products, "Natural Remedies" is placed prominently at the top in all capital letters, and on the back panel of its witch hazel astringents, Defendant describes the Products as a "natural, gentile skin astringent" which is "derived from a time-honored Native American formula."

10.     This deception is not limited to Defendant's labeling and is omnipresent in its marketing efforts, including on its website and social media accounts, which further perpetuate this deceptive "natural" myth.

11.     For example, the terms "naturally sourced ingredients," "natural glow," "natural remedy," and "natural healing powers" are used to describe Products throughout Defendant's official website.

12.     In addition to these "natural" descriptions on its website, Defendant uses "natural" hashtags and representations, including #natural, #naturalbeauty, #naturalingredients, #naturalremedies, and #naturalskincare, to further evoke this "natural" myth in almost every one of its social media advertisements and postings. For example, the Defendant's official Twitter profile describes the Products as "All-natural skincare elixirs and health remedies #Since1847."

13.     Contrary to representations on the Products' labeling and marketing, instead of receiving natural products, consumers receive products with unnatural and/or synthetic ingredients.

14.     Plaintiff and Class Members paid for the Products over and above comparable products that did not purport to be "Natural." Given that Plaintiff and Class Members paid for the Products based on Defendant's misrepresentations that they are "Natural," Plaintiff and Class Members suffered an injury in the amount paid.

15.     Additionally, Plaintiff and Class Members paid a premium for the Products over and above comparable products that did not purport to be "Natural." Given that Plaintiff and Class Members paid a premium for the Products based on Defendant's misrepresentations that they are "Natural," Plaintiff and Class Members suffered an injury in the amount of the premium paid.

16.     Defendant's conduct violated and continues to violate, *inter alia*, the Missouri Merchandising Practices Act. Defendant breached and continues to breach its express warranties regarding the Products. Defendant has been and continues to be unjustly enriched. Accordingly, Plaintiff brings this action against Defendant on behalf of herself and Class Members who purchased the Products during the applicable statute of limitations period (the "Class Period").

## FACTUAL BACKGROUND

17.    Consumers have become increasingly concerned about the effects of synthetic and chemical ingredients in food, cleaning products, bath and beauty products and everyday household products.[2] Companies such as the Defendant have capitalized on consumers' desires for purportedly "natural products." Indeed, consumers are willing to pay, and have paid, a premium for products branded "natural" over products that contain synthetic ingredients. In 2015, sales of natural products grew 9.5% to $180 billion.[3] Reasonable consumers, including Plaintiff and Class Members, value natural products for important reasons, including the belief that they are safer and healthier than alternative products that are not represented as natural.

18.    In April 2016, the Federal Trade Commission ("FTC") settled with four manufacturers and filed a complaint against a fifth company for representing that its products were "natural" when they contained Phenoxyethanol. The manufacturers agreed to cease marketing the products in question as being "natural."[4]

---

[2] Julianna M. Butler & Christian A. Vossler, *What is an Unregulated and Potentially Misleading Label Worth? The case of "Natural"-Labelled Groceries*, Environmental & Resource Economics, Springer; European Association of Environmental and Resource Economists, vol. 70(2), pages 545-564 (2017). "Thus, one finding is that most people – 87% of our sample – do appear to attribute meaning to "natural" labelling. The vast majority of respondents stated a belief that "natural" signals no artificial flavors, colors and/or preservatives." *Id.*

[3] *Natural Products Industry Sales up 9.5% to $180bn Says NBJ*, FOOD NAVIGATOR, http://www.foodnavigator-usa.com/Markets/EXPO-WEST-trendspotting-organics-natural-claims/(page)/6 ; *see also* Shoshanna Delventhal, *Study Shows Surge in Demand for "Natural" Products*, INVESTOPEDIA (February 22, 2017), http://www.investopedia.com/articles/investing/022217/study-shows-surge-demand-natural-products.asp (Study by Kline Research indicated that in 2016, the personal care market reached 9% growth in the U.S. and 8% in the U.K. The trend-driven natural and organic personal care industry is on track to be worth $25.1 million by 2025).

[4] *Four Companies Agree to Stop Falsely Promoting Their Personal-Care Products as "All Natural" or "100% Natural"; Fifth is Charged in Commission Complaint*, (April 2016), https://www.ftc.gov/news-events/press-releases/2016/04/four-companies-agree-stop-falsely-promoting-their-personal-care (last visited Nov. 16, 2020).

19.     Despite the Products containing a number of synthetic ingredients, including for example the aforementioned Phenoxyethanol, Defendant markets the Products as being "Natural Remedies" and this false and misleading statement appears prominently on the front label of all of its Products.

20.     Defendant's representations that the Products are "Natural" are false, misleading, and deceptive because the Products contain multiple ingredients that are, as set forth and described below, synthetic and artificial.

   a.  **Phenoxyethanol** is a synthetic substance associated with depressing the central nervous system, vomiting, and diarrhea.[5]

   b.  **Potassium Sorbate** is a synthetic preservative.[6] It is created by using potassium hydroxide (KOH) to neutralize sorbic acid (C6H802). The resulting potassium sorbate may be crystallized from aqueous ethanol. Studies have shown Potassium Sorbate to have genotoxic effects on humans and other mammals.[7] It causes chromosomal aberrations in cells, which can trigger the development of cancer.[8]

   c.  **Polysorbate-20** is a synthetic emulsifier and/or surface-active agent.[9]

---

[5] 21 C.F.R. §172.515 *and FDA Consumer Update: Contaminated Nipple Cream*, (May 2008), https://web.archive.org/web/20140712202507/https://www.fda.gov/ForConsumers/ConsumerUpdates/ucm049301.htm (last visited Nov. 16, 2020).
[6] U.S. Dept. of Agriculture, CFNP TAP Review, *Potassium Sorbate*, https://www.ams.usda.gov/sites/default/files/media/P%20Sor%20technical%20advisory%20panel%20report.pdf and *see* FDA Warning Letter to Bagels Forever (dated 7/22/2011) (available at: http://wayback.archive-it.org/7993/20170112193358/http://www.fda.gov/ICECI/EnforcementActions/WarningLetters/2011/ucm265756.htm): "Your product is manufactured with infused wild dry blueberries that contain potassium sorbate, which is listed in 21 CFR 182.3640 as a chemical preservative; therefore, your product may not make the claims 'All Natural' and 'No Preservatives.'"
[7] Sevcan Mamur et al., Does Potassium Sorbate Induce Genotoxic or Mutagenic Effects in Lymphocytes?, TOXICOLOGY IN VITRO 790, 793 (2010).
[8] *Id.*
[9] *See* 21 C.F.R. § 172.515 and 21 C.F.R. § 178.3400.

d. **Sodium Benzoate** is a synthetic preservative.[10] Sodium Benzoate is produced by the neutralization of benzoic acid with sodium hydroxide, or by adding benzoic acid to a hot concentrated solution of sodium carbonate until effervescence ceases. The solution is then evaporated, cooled and allowed to crystalize or evaporate to dryness, and then granulated. It does not occur naturally.[11] Sodium Benzoate has been shown to cause DNA damage and chromosomal aberrations.[12] When Sodium Benzoate combines with either Ascorbic Acid or Citric Acid (an ingredient common in many cosmetic and food products), the two substances can react to produce benzene, which is a highly toxic carcinogen that causes leukemia.[13]

e. **Caprylyl Glycol** is a synthetic skin conditioning agent and preservative.[14]

f. **Propanediol** is a synthetic liquid substance that absorbs water.[15]

---

[10] 21 C.F.R. § 582.3733.

[11] 21 C.F.R. § 184.1733.

[12] N. Zengin et al., The Evaluation of the Genotoxicity of Two Food Preservatives: Sodium Benzoate and Potassium Benzoate, FOOD AND CHEMICAL TOXICOLOGY 763, 764-68 (2011).

[13] U.S. Food and Drug Administration, *Questions and Answers on the Occurrence of Benzene in Soft Drinks and Other Beverages*, (2018), https://www.fda.gov/food/chemicals/questions-and-answers-occurrence-benzene-soft-drinks-and-other-beverages#q4  (last visited Nov. 16, 2020). *See Gonzalez v. Pepsico, Inc.*, 489 F. Supp. 2d 1233, 1238 (D. Kan. 2007): "[P]roducts from defendants which contained sodium benzoate and ascorbic acid, citric acid or erythoribic acid. The Food and Drug Administration ("FDA") has reported that these ingredients may interact to form benzene, a hazardous substance which the Environmental Protection Agency ("EPA") knows to potentially cause anemia, nervous systems disorders and immunosuppression in persons who are exposed..." *and* Robert Snyder, *Leukemia and Benzene*, International Journal of Environmental Research and Public Health vol. 9,8 (2012): 2875-93 *and* Lakshmi Narayanan Venu & Anoop Austin, *Study and Quantification of Preservative (E211) In Carbonated Soft Drink Samples*, International Organization of Scientific Research Journal of Applied Chemistry vol. 12,4 (2019): 17-23 ("Sodium benzoate reacts with citric acid or ascorbic acid to form benzene.").

[14] ¶ 17,483 ABS CONSUMER PRODUCTS, LLC—COMPLAINT AND CONSENT ORDER, FTC DKT. C-4584, FILE NO. 152 3269, ANNOUNCED APRIL 12, 2016; ISSUED JULY 6, 2016., Trade Reg. Rep. P 17483.

g. **Maltodextrin** is a factory-produced texturizer that is created by complex processing. To produce Maltodextrin, acids, enzymes, or acids and enzymes[16] are applied in sequence to a starch slurry to induce partial hydrolysis (saccharification). In other words, the acids or enzymes convert or depolymerize starch to glucose or maltose molecules.[17] Once maltose content is high enough for Maltodextrin, the acids or enzymes are neutralized, removed or deactivated, and the resulting product is then refined, purified, and concentrated.[18]

h. **Fragrance** is a synthetic ingredient that includes unknown and unregulated chemical compounds. A simple declaration of "fragrance" on the ingredients list can include a composition consisting of as many as 200 ingredients.

i. **Citric Acid** is recognized by the FDA and other federal agencies as an unnatural substance.[19] Citric acid is added as a synthetic preservative, flavorant, and acidity regulator. It is commonly manufactured through solvent extraction or mycological fermentation of bacteria.[20]

---

[15] National Institute of Health's National Library of Medicine, Propylene glycol *available at* https://pubchem.ncbi.nlm.nih.gov/compound/Propylene-glycol (last visited November 21, 2020).

[16] CORN REFINERS ASSOCIATION, NUTRITIVE SWEETENERS FROM CORN 20 (2006), 17-19 *available at* http://www.corn.org/wp-content/uploads/2009/12/NSFC2006.pdf (last accessed November 19, 2020).

[17] H. Guzman-Maldonado, Amylolytic Enzymes and Products Derived from Starch: A Review, 35(5) CRIT. REV. FOOD SCI. NUTR. 373 (Sept. 1995).

[18] CORN REFINERS ASSOCIATION, NUTRITIVE SWEETENERS FROM CORN 20 (2006), 17-19 *available at* http://www.corn.org/wp-content/uploads/2009/12/NSFC2006.pdf (last accessed November 19, 2020).

[19] *See* FDA Informal Warning Letter to the Hirzel Canning Company (August 29, 2001) ("the addition of calcium chloride and citric acid to these products preclude use of the term 'natural' to describe this product."); U.S. International Trade Commission, Synthetic Organic Chemical Index, USCTIC Pub. 2933, at 3-105 (Nov. 1995).

[20] 21 C.F.R. § 184.1033(a).

21.     While the exact composition of each product is slightly different, the deception remains the same.[21] All the Products are marketed as "natural" while containing synthetic ingredients.

22.     Moreover, at times during the statutory period, Defendant's website deceptively described its Unscented Facial Toner product as "safe for babies and children"[22] and "recommended for babies and children"[23] despite the fact that this product contains a synthetic ingredient, Phenoxyethanol. This synthetic chemical concerned the FDA, and the agency warned consumers against using on nursing infants because it "can depress the central nervous system" and "may cause vomiting and diarrhea, which can lead to dehydration in infants."[24] Concern for the use of this synthetic ingredient is not restricted to the United States, and after concerns were raised by the European Commission's Scientific Committee on Consumer Safety, France prohibited the labeling and marketing of products containing Phenoxyethanol for use on children that are three years old and younger.[25]

23.     Further, Defendant actively promotes its Products directly to pregnant women:[26]

---

[21] Exhibit A lists each of the offending Products with a description of the synthetic contents therein.
[22] THAYERS® Natural Remedies, FAQ (Archived on April 17, 2019), https://web.archive.org/web/20190926054206/https://www.thayers.com/faq/#1501085871441-7880e658-dc1a.
[23] *Id.*
[24] U.S. Food and Drug Administration, For Consumers, *Contaminated Nipple Cream*, https://web.archive.org/web/20140712202507/https://www.fda.gov/ForConsumers/ConsumerUpdates/ucm049301.htm (last visited Nov. 16, 2020).
[25] Agence Nationale de Sécurité du Médicament et des Produits de Santé, Decision of 13 Mars 2019, *available at* https://www.ansm.sante.fr/content/download/158253/2075101/version/1/file/DPS_Phenoxyethanol-200319.pdf.
[26] Names redacted for privacy.



24.     Additionally, some of the synthetic ingredients included in Defendant's Products "can form extremely unhealthy, dangerous chemicals." For example, "Benzene is obtained through the reaction of sodium benzoate with citric acid and/or ascorbic acid."[27]

25.     Nevertheless, some of Defendant's Products contain both Sodium Benzoate and Citric Acid. Therefore, the ingredients present in these products can produce Benzene in their combined state.[28] Exposure to Benzene is a proven cause of leukemia.[29]

26.     Other ingredients in the Products may also be not natural as well. Plaintiff's investigation is ongoing and will seek to amend the Complaint to specify other potential unnatural ingredients in the future.

27.     Whether Defendant's labeling of the Products as "Natural" is deceptive is judged by whether it would deceive or mislead a reasonable person. To assist in ascertaining what a

---

[27] Venu & Austin, *supra* note 13.
[28] *Id.*
[29] Snyder, *supra* note 13.

reasonable consumer believes the term natural means, one can look to regulatory agency guidance.

28.     In 2013, the United States Department of Agriculture ("USDA") issued a Draft Guidance Decision Tree for Classification of Materials as Synthetic or Nonsynthetic (Natural). In accordance with this decision tree, a substance is natural—as opposed to synthetic—if: (a) it is manufactured, produced, or extracted from a natural source (i.e. naturally occurring mineral or biological matter); (b) it has not undergone a chemical change (i.e. a process whereby a substance is transformed into one or more other distinct substances) so that it is chemically or structurally different than how it naturally occurs in the source material; or (c) the chemical change was created by a naturally occurring biological process such as composting, fermentation, or enzymatic digestion or by heating or burning biological matter.[30]

29.     Surveys and other market research, including expert testimony Plaintiff intends to introduce, will demonstrate that the term "natural" is misleading to a reasonable consumer because the reasonable consumer believes that the term "natural," when used to describe goods such as the Products, means that the goods are free of synthetic ingredients. By way of example, according to a consumer survey, "[e]ighty-six percent of consumers expect a 'natural' label to mean processed foods do not contain any artificial ingredients."[31]

---

[30] U.S. Department of Agriculture, Draft Guidance Decision Tree for Classification of Materials as Synthetic or Nonsynthetic, March 26, 2013, available at https://web.archive.org/web/20140818174458/http://www.ams.usda.gov/AMSv1.0/getfile?dDocName=STELPRDC5103308.

[31] Urvashi Rangan, Comments of Consumers Union on Proposed Guides for Use of Environmental Marketing Claims, 16 C.F.R. Part 260, Notice of the Federal Trade Commission (2010), available at https://www.ftc.gov/sites/default/files/documents/public_comments/guides-use-environmental-marketing-claims-project-no.p954501-00289%C2%A0/00289-57072.pdf (also accessible as Comment 58 at http://www.ftc.gov/policy/publiccomments/initiative-353).

30.    A reasonable consumer's understanding of the term "Natural" comports with that of federal regulators and common meaning. That is, the reasonable consumer understands the representation that a product is "Natural" to mean that it does not contain any synthetic or artificial ingredients.[32]

31.    Consumers lack the meaningful ability to test or independently ascertain or verify whether a product is natural, especially at the point of sale. Consumers would not know the true nature of the ingredients merely by reading the ingredients label.

32.    Discovering that the ingredients are not natural and are actually synthetic requires an investigation beyond that of the skills of the average consumer. That is why, even though the ingredients listed above are identified on the back of the Products' packaging in the ingredients listed, the reasonable consumer would not understand – nor are they expected to understand - that these ingredients are synthetic.

33.    Moreover, the reasonable consumer is not expected or required to scour the ingredients list on the back of the Products in order to confirm or debunk Defendant's prominent front-of-the-product claims, representations, and warranties that the Products are "Natural."

34.    Defendant did not disclose that the above listed ingredients are synthetic ingredients anywhere on the product. A reasonable consumer understands Defendant's "Natural" claims to mean that the Products are "Natural" and do not contain synthetic ingredients.

---

[32] Julianna M. Butler & Christian A. Vossler, *What is an Unregulated and Potentially Misleading Label Worth? The case of "Natural"-Labelled Groceries*, Environmental & Resource Economics, Springer; European Association of Environmental and Resource Economists, vol. 70(2), pages 545-564 (2017). "The vast majority of respondents stated a belief that "natural" signals no artificial flavors, colors and/or preservatives." *Id.*

35.    For a period of time, Defendant failed to disclose all of the synthetic ingredients in the Products which further misled consumers into believing that Defendant's Products were "natural."

36.    Plaintiff and members of the classes described below paid a premium for Defendant's Products over comparable products that did not purport to be natural products. Contrary to representations on the Products' labeling and Defendant's marketing thereof, instead of receiving natural products, consumers receive products with unnatural and/or synthetic ingredients.

37.    Defendant has thus violated, *inter alia*, the Missouri Merchandising Practices Act by deceiving and misrepresenting to Plaintiff that the Products are "natural" when in fact they are made with synthetic ingredients.

38.    Consumers rely on label representations and information in making purchasing decisions.

39.    The marketing of the Products as "Natural Remedies" in a prominent location on the labels of all of the Products, throughout the Class Period, evidences Defendant's awareness that "Natural" claims are material to consumers.

40.    Defendant's deceptive representations and omissions are material in that a reasonable person would attach importance to such information and would be induced to act upon such information in making purchase decisions.

41.    Plaintiff and the Class members reasonably relied to their detriment on Defendant's misleading representations and omissions.

42.     Defendant's false, misleading, and deceptive misrepresentations and omissions are likely to continue to deceive and mislead reasonable consumers and the general public, as they have already deceived and misled the Plaintiff and the Class Members.

43.     In making the false, misleading, and deceptive representations and omissions described herein, Defendant knew and intended that consumers would pay a premium for Products labeled "Natural" over comparable products not so labeled.

44.     As an immediate, direct, and proximate result of Defendant's false, misleading, and deceptive representations and omissions, Defendant injured the Plaintiff and the Class Members in that they:

a.   Paid a sum of money for Products that were not what Defendant represented;

b.   Paid a premium price for Products that were not what Defendant represented;

c.   Were deprived of the benefit of the bargain because the Products they purchased were different from what Defendant warranted; and

d.   Were deprived of the benefit of the bargain because the Products they purchased had less value than what Defendant represented.

45.     Had Defendant not made the false, misleading, and deceptive representations and omissions, Plaintiff and the Class Members would not have been willing to pay the same amount for the Products they purchased, and, consequently, Plaintiff and the Class Members would not have been willing to purchase the Products.

46.     Plaintiff and the Class Members paid for Products that were "Natural" but received Products that were not "Natural." The products Plaintiff and the Class Members received were worth less than the products for which they paid.

47.     Based on Defendant's misleading and deceptive representations, Defendant was able to, and did, charge a premium price for the Products over the cost of competitive products not bearing "Natural "representations.

48.     Plaintiff and the Class Members all paid money for the Products. However, Plaintiff and the Class Members did not obtain the full value of the advertised Products due to Defendant's misrepresentations and omissions. Plaintiff and the Class Members purchased, purchased more of, and/or paid more for, the Products than they would have had they known the truth about the Products. Consequently, Plaintiff and the Class Members have suffered injury in fact and lost money as a result of Defendant's wrongful conduct.

## JURISDICTION AND VENUE

49.     This Court has personal jurisdiction over Defendant. Defendant purposefully avails itself of the Missouri consumer market and distributes the Products to many locations within this County and hundreds of retail locations throughout the State of Missouri, where the Products are purchased by hundreds of consumers every day.

50.     This Court has original subject-matter jurisdiction over this proposed class action pursuant to 28 U.S.C. § 1332(d), which, under the provisions of the Class Action Fairness Act ("CAFA"), explicitly provides for the original jurisdiction of the federal courts in any class action in which at least 100 members are in the proposed plaintiff class, any member of the plaintiff class is a citizen of a State different from any defendant, and the matter in controversy exceeds the sum of $5,000,000.00, exclusive of interest and costs. Plaintiff alleges that the total claims of individual members of the proposed Class (as defined herein) are well in excess of $5,000,000.00 in the aggregate, exclusive of interest and costs.

51.     Venue is proper in this District under 28 U.S.C. § 1391(a). Plaintiff's purchases of Defendant's Products, substantial acts in furtherance of the alleged improper conduct, including the dissemination of false and misleading information regarding the nature, quality, and/or ingredients of the Products, occurred within this District and the Defendant conducts business in this District.

## PARTIES

52.     Plaintiff is a citizen of Missouri, residing in St. Louis County. Within the past five years, and most recently in October 2020, she purchased Defendant's Products from physical retail stores in Missouri. In October 2020, she purchased THAYERS® Natural Remedies Rose Petal Facial Toner and paid $7.19.[33] Prior to purchasing THAYERS® Natural Remedies Products, Plaintiff saw and read the front of the product packaging, and relied on the representation and warranty that the product would be a "natural remedy" and "natural." Plaintiff understood these representations to mean that THAYERS® Natural Remedies Products did not contain synthetic chemicals. Plaintiff purchased THAYERS® Natural Remedies Products at a substantial price premium, and would not have purchased the products had she known that the labeling and marketing she relied on was false, misleading, and deceptive. Plaintiff would purchase the Products again in the future if Defendant changed the composition of the Products so that they conformed to their "natural" labeling and marketing.

53.     Defendant Henry Thayer Company, Inc. is a Delaware corporation with its principal place of business in Easton, Connecticut.

    a.   From its headquarters in Connecticut, Defendant produces, markets and
         distributes various consumer skin care products in retail stores across the United

---

[33] At time of this purchase, the listed price was $11.99, and while Plaintiff would have been willing to pay this price, she used a 40% off coupon provided through the CVS mobile application which reduced the price she paid in the October 2020 purchase to $7.19.

States including stores physically located in the State of Missouri and this district as well as e-commerce stores that ship to consumers in this district. Defendant knew that the labeling and marketing of the Products is false and misleading to a reasonable consumer, because the Products contain Phenoxyethanol, Potassium Sorbate, Polysorbate 20, Sodium Benzoate, Caprylyl Glycol, Propanediol, Maltodextrin, Fragrance, Citric Acid, and other synthetic ingredients and preservatives, which are inconsistent with the Product's labeling and other marketing.

54.     Plaintiff reserves the right to amend this Complaint to add different or additional defendants, including without limitation any officer, director, employee, supplier, or distributor of Defendant who has knowingly and willfully aided, abetted, or conspired in the false and deceptive conduct alleged herein.

55.     Whenever reference is made in this Complaint to any representation, act, omission, or transaction of a defendant, that allegation shall mean that the defendant did the act, omission, or transaction through its officers, directors, employees, agents, and/or representatives while they were acting within the actual or ostensible scope of their authority.

## FACTS COMMON TO ALL CAUSES OF ACTION

56.     Consumers have become increasingly concerned about the effects of synthetics and chemical ingredients in cosmetic products. As a result, consumers are willing to pay, and have paid, a premium for products labeled "natural" over ordinary products that contain synthetic ingredients.

57.     The FTC has warned marketers that the use of the term "natural" may be deceptive: Marketers that are using terms such as natural must ensure that they can substantiate whatever claims they are conveying to reasonable consumers. If reasonable consumers could interpret a natural claim as representing that a product contains no artificial ingredients, then the marketer must be able to substantiate that fact.[34]

58.     Likewise, the Food and Drug Administration ("FDA") warns that any "natural" labeling on cosmetic products must be "truthful and not misleading."[35]

59.     The THAYERS® Natural Remedies brand is manufactured and marketed by Defendant and sold in drug, grocery, and other retail stores nationwide. On its Facebook Page, Defendant underscores the fact that its success comes from "[a] longstanding commitment to making effective, **natural remedies with high-quality ingredients**…" (emphasis added).

60.     THAYERS® Natural Remedies brand products that are the subject of this lawsuit include all Products listed in Paragraph 3.

61.     The front label of every one of the THAYERS® Products state the words "Natural Remedies."

62.     THAYERS® Products have been labeled "Natural" and "Natural Remedies" at all times during the last five years at a minimum.[36]

63.     For example, the following image shows that the representation "Natural" and "Natural Remedies" is prominently made on the front of the THAYERS® Natural Remedies Rose Petal Facial Facial Mist:[37]

---

[34] 75 Fed. Reg. 63552, 63586 (Oct. 15, 2010).

[35] U.S. Food and Drug Administration, Small Business & Homemade Cosmetics: Fact Sheet, available at http://www.fda.gov/Cosmetics/ResourcesForYou/Industry/ucm388736.htm#7.

[36] Archive of Defendant's Official Website Store from January 12, 2012 *available at* https://web.archive.org/web/20120112034652/http://www.thayers.com/store/index.php?main_page=product_info&cPath=3&products_id=25.



64.     Based on the language that appears on the front of each product, Plaintiff reasonably believed that Products contained only natural ingredients.

65.     This same representation appears on every Product. For example, the label for the Unscented Facial Mist makes the same representations:

---

[37] Emphasis added.



66.     The phrase "Natural Remedies" is a representation to a reasonable consumer that THAYERS® brand Products contain only natural ingredients. The phrase is misleading to a reasonable consumer because THAYERS® brand Products actually contain synthetic ingredients.

67.     While now presently listed on the Ingredients Declaration section on the product, certain synthetic ingredients, including Phenoxyethanol, were deceptively omitted from this section for many years in the Class Period which deceived customers into purchasing Products:[38]

---

[38] Emphasis added.



Mayanmoonz

★☆☆☆☆ **The product has been revised for the WORSE.**

September 21, 2019

Flavor: Cucumber | **Verified Purchase**

I have been using Thayers for a number of years and it WAS a great product. The last time I ordered a non-alcohol formula I got the original formula WITH ALCOHOL and a much longer list of additives. It BURNED MY FACE LIKE CRAZY. Amazon corrected the mistake but after looking at the recent Thayer's labels, they have added 'phenoxyethanol' to their ingredients. Witch Hazel a time honored formula, passed on for generations that never USED to NEED a preservative, WHY NOW??. Some of the cheaper manufacturers add 14% alcohol but Thayers was a brand you could trust that didn't contain it, it was simply extracted from the witch hazel plant. Well something has changed. The company management, policies, ethics, whatever. I hope I can find another brand that remains time honored the way this one USED TO.

One person found this helpful

| Helpful |   ↑ **1 comment** | Report abuse

Comment

Showing 1 comments                                                    Sort by:  **Newest**   Oldest

**THAYERS Natural Remedies**  19 days ago                                      Report abuse

Hi Mayanmoonz, we want all who use our product to have a positive experience and we apologize for the poor reaction your skin had to our product. We do our best to try and educate our consumers on the differences between our Facial Toners and Astringents, as our Facial Toners are alcohol free, while all of our Astringent products contain alcohol to further help control oil production and acne-causing bacteria. We also always recommend patch testing when trying new products, as we create a range of products that may not always be the most suitable option for every skin type. We appreciate the feedback on Phenoxyethanol. While Phenoxyethanol has been part of our composition for many years there was a period of time that it was not listed on the label. We can assure you that despite a change to our labels the quality, safety and efficacy of our product remains unchanged. We use Phenoxyethanol in our Witch Hazel as a natural preservative. This ingredient is widely used in the natural industry in cosmetics and skin care products as a natural replacement for parabens and formaldehyde releasing ingredients. As our percentages are proprietary, the ingredient is very low. I hope this helps! Let us know if you have any additional questions at info@thayers.com or give us a call at 1-888-THAYER-1 (1-888-842-9371).

⌄ Leave a reply

Amazon Customer

★☆☆☆☆ **No longer the original witch hazel**

Reviewed in the United States on April 22, 2020

**Verified Purchase**

Sadly, this is no longer what it used to be. The ingredients have changed and it gave me a red rash on my cheeks and forehead... time to look for another brand.

| Helpful |   ↑ 1 comment | Report abuse

Comment

Showing 1 comments                                                    Sort by:  **Newest**   Oldest

**THAYERS Natural Remedies**  5 months ago                                      Report abuse

Hi there, thanks for reaching out to us. We want all who use our product to have a positive experience and we apologize for the poor reaction your skin had to our product. While Phenoxyethanol has been part of our composition for many years there was a period of time that it was not listed on the label. We can assure you that despite a change to our labels the quality, safety and efficacy of our product remains unchanged. Phenoxyethanol is widely used in the natural industry in cosmetics and skin care products as a natural preservative and replacement for parabens and formaldehyde releasing ingredients. There is less than 1% in our products and it does not react with other ingredients, air or light, making it a very stable and effective preservative. If you have any further concerns, please feel free to contact us at info @ thayers .com.

⌄ Leave a reply



68.     Defendant knew that consumers will pay more for a product marketed as "Natural," and intended to deceive Plaintiff and putative Class Members by labeling and marketing THAYERS® Natural Remedies brand Products as purportedly natural products.

## CLASS DEFINITIONS AND ALLEGATIONS

69.     Plaintiff, pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3), brings this action on behalf of the following classes:

    a.  Missouri Subclass: All persons who purchased Defendant's Products within the State of Missouri and within the applicable statute of limitations period;

    b.  Nationwide Class: All persons who purchased Defendant's Products within the United States and within the applicable statute of limitations period (collectively, the "Classes" and "Class Members").

70.     Excluded from the Classes are Defendant, its parents, subsidiaries, affiliates, officers, and directors, those who purchased the Products for resale, all persons who make a timely election to be excluded from the Classes, the judge to whom the case is assigned and any immediate family members thereof, and those who assert claims for personal injury.

71.     The members of the Classes are so numerous that joinder of all Class Members is impracticable. Defendant has sold, at a minimum, tens of thousands of units of the Products to Class Members.

72.     There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the putative classes that predominate over questions that may affect individual Class Members include, but are not limited to the following:

    a.  whether Defendant misrepresented material facts concerning the Products on the label of every product;

    b.  whether Defendant's conduct was unfair and/or deceptive;

    c.  whether Defendant has been unjustly enriched as a result of the unlawful, fraudulent, and unfair conduct alleged in this Complaint such that it would be inequitable for Defendant to retain the benefits conferred upon them by Plaintiff and the classes;

    d.  whether Plaintiff and the Class are entitled to equitable and/or injunctive relief;

    e.  whether Defendant breached express warranties to Plaintiff and the classes;

    f.  whether Plaintiff and the classes have sustained damages with respect to the claims asserted, and if so, the proper measure of their damages.

73.     Plaintiff's claims are typical of those of other Class Members because Plaintiff, like all members of the classes, purchased Defendant's Products bearing the natural representations and Plaintiff sustained damages from Defendant's wrongful conduct.

74.     Plaintiff will fairly and adequately protect the interests of the classes and has retained counsel that is experienced in litigating complex class actions. Plaintiff has no interests which conflict with those of the classes.

75.     A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiff and the other Class Members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, making it impracticable for Class Members to individually seek redress for Defendant's wrongful conduct. Even if Class Members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

76.     The prerequisites to maintaining a class action for equitable relief are met as Defendant has acted or refused to act on grounds generally applicable to the classes, thereby making appropriate equitable relief with respect to the classes as a whole.

77.     The prosecution of separate actions by members of the classes would create a risk of establishing inconsistent rulings and/or incompatible standards of conduct for Defendant. For example, one court might enjoin Defendant from performing the challenged acts, whereas another might not. Additionally, individual actions could be dispositive of the interests of the classes even where certain Class Members are not parties to such actions.

## COUNT I
### Violation of Missouri's Merchandising Practices Act, ("MMPA")
### Deception, 15 CSR 60-9.020
### (As to the Missouri Subclass Only)

78.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

79.     Plaintiff brings this Count individually and on behalf of the members of the Missouri Subclass.

80.     The acts and practices engaged in by Defendant, and described herein, constitutes unlawful, unfair and/or fraudulent business practices in violation of the Missouri Merchandising Practices Act ("MMPA"), Mo. Rev. Stat. §§ 407.010, et seq.

81.     Defendant's actions alleged herein violated, and continue to violate, the MMPA.

82.     Defendant is a "person" within the meaning of the MMPA. Missouri Revised Statutes § 407.010(5).

83.     The goods purchased from Defendant are "merchandise" within the meaning of the MMPA. Missouri Revised Statutes § 407.010(4).

84.     The transactions resulting in purchases of goods from Defendant in Missouri are a "sale" within the meaning of the MMPA. Missouri Revised Statutes § 407.010(6).

85.     Defendant engaged in unlawful practices including deception, false promises, misrepresentation, and/or the concealment, suppression, or omission of material facts in connection with the sale, distribution or advertisement of the Products in violation of Mo. Rev. Stat. § 407.020, which states in relevant part as follows:

> 407.020. 1. The act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce ... is declared to be an unlawful practice. ... Any act, use or employment declared unlawful by this

subsection violates this subsection whether committed before, during or after the sale, advertisement or solicitation.

86.     Plaintiff and Class Members purchased the Products, products that were deceptively represented as "natural," as stated above, in violation of the Missouri Merchandising Practices Act and as a result Plaintiff suffered economic damages, in that the product she and other Class Members purchased was worth less than the product they thought they had purchased had Defendant's representations been true.

87.     For a period of time in the statutory period, Defendant failed to disclose the presence of certain synthetic ingredients on the Ingredients Declaration section of Products' labels which further deceived consumers into purchasing Products.

88.     At all times relevant herein, Plaintiff was unaware that the Products were not "natural."

89.     At all times relevant herein, Plaintiff was unaware that the Products contained artificial ingredients.

90.     Defendant's labeling for the Products does not disclose that the Products are not "natural."

91.     Defendant's labeling for the Products does not disclose that the Products contain artificial ingredients.

92.     Defendant's representations that the Products were "natural" and "natural remedies" was a violation of the Missouri Merchandising Practices Act, as further stated herein, and was a material misrepresentation.

93.     The foregoing acts and practices of Defendant constituted unfair and unlawful practices, and deceptive conduct, in violation of the Missouri Merchandising Practices Act.

94.     As a direct proximate result of the above-described practices, Plaintiff and Class Members suffered ascertainable loss of money due to the purchasing of the Products.

95.     Appropriate injunctive relief is necessary to prevent Defendant's MMPA violations from continuing. If Defendant's violations of the MMPA are not stopped by such injunctive relief, Plaintiff and the members of the Class will continue to suffer injury.

96.     Defendant's misrepresentations and omissions were material because they were likely to deceive reasonable consumers.

97.     As a direct and proximate result of Defendant's deceptive acts and practices, Plaintiff and the Missouri Subclass have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the Products.

98.     Plaintiff and other members of the Missouri Subclass lost money or property as a result of Defendant's violations because: (a) they would not have purchased the Products on the same terms if they knew that the Products were made with unnatural and synthetic ingredients (b) they paid a substantial price premium compared to other skin care and hygiene products due to Defendant's misrepresentations and deceptions; and (c) the Products do not have the characteristics, uses, or benefits as promised.

99.     Plaintiff and the Missouri Subclass seek all monetary and non-monetary relief allowed by law, including treble damages, attorneys' fees and costs, and any additional relief this Court deems necessary or proper.

**COUNT II**
**Violation of Missouri's Merchandising Practices Act, ("MMPA")**
**Misrepresentation, 15 CSR 60-9.070**
**(As to the Missouri Subclass Only)**

100.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

101.    Plaintiff brings this Count individually and on behalf of the members of the Missouri Subclass.

102.    "A misrepresentation is an assertion that is not in accord with the facts." 15 CSR 60-9.070.

103.    As described further herein, the presence or lack of synthetic chemicals in a product is a fact which may "induce a reasonable consumer to act, respond or change his/her behavior in any substantial manner."

104.    Defendant's representations that the Products were "natural" – when the Products contained multiple synthetic ingredients - is a violation of the Missouri Merchandising Practices Act, as further stated herein, and was a material misrepresentation.

105.    Defendant's representations that the ingredients contained within the Products are natural is a material misrepresentation.

106.    Defendant's representation that the Products did not contain Phenoxyethanol – when the Products did contain this ingredient – is a misrepresentation.

107.    During the statutory period – by Defendant's own admission – it failed to disclose the presence of certain synthetic ingredients, including but not limited to Phenoxyethanol, on the Products' labels.

108.    Defendant's misrepresentations were material because they were likely to deceive reasonable consumers.

109.    Plaintiff purchased the Products for personal, family, or household purposes.

110.    Plaintiff suffered an ascertainable loss as a result of Defendant's unlawful conduct because the actual value of the Products as purchased was less than the value of the Products as represented. In addition, the Products are legally worthless.


**COUNT III**
**Violation of Missouri's Merchandising Practices Act, ("MMPA")**
**Concealment or Omission of any Material Fact, 15 CSR 60-9.110**
**(As to the Missouri Subclass Only)**

111.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

112.    Plaintiff brings this Count individually and on behalf of the members of the Missouri Subclass.

113.    The MMPA prohibits as an unlawful practice the act, use or employment of the "concealment, suppression or omission of any material fact" in connection with the sale or advertisement of any merchandise in trade or commerce. §407.020.1, RSMo.

114.    A "material fact" is defined as "any fact which a reasonable consumer would likely consider to be important in making a purchasing decision, or which would be likely to induce a person to manifest his/her assent, or which the seller knows would be likely to induce a particular consumer to manifest his/her assent, or which would be likely to induce a reasonable consumer to act, respond or change his/her behavior in any substantial manner." 15 CSR 60-9.010(1)(C).

115.    "Concealment of a material fact" is defined as "any method, act, use or practice which operates to hide or keep material facts from consumers." 15 CSR 60-9.110(1).

116.    "Omission of a material fact" is defined as "any failure by a person to disclose material facts known to him/her, or upon reasonable inquiry would be known to him/her." 15 CSR 60-9.110(3).

117.    Defendant's actions as alleged herein constitute the concealment and omission of material facts.

118.    Among other things, Defendant concealed and omitted the material facts that the Products were not "natural."

119.    As described further herein, the representation that a product is "natural" is a fact which may "induce a reasonable consumer to act, respond or change his/her behavior in any substantial manner."

120.    Defendant's labeling for the Products does not disclose that the Products contain synthetic ingredients.

121.    Defendant's labeling for the Products does not disclose which, if any, ingredients are synthetic.

122.    As described further herein, the presence or lack of synthetic chemicals in a product is a fact which may "induce a reasonable consumer to act, respond or change his/her behavior in any substantial manner."

123.    During the statutory period – by Defendant's own admission – it failed to disclose the presence of certain synthetic ingredients, including but not limited to Phenoxyethanol, on the Products' labels.

124.    As described further herein, the presence or lack of Phenoxyethanol in a product is a fact which may "induce a reasonable consumer to act, respond or change his/her behavior in any substantial manner."

125.    Defendant's failure to disclose certain the presence of certain synthetic ingredients, including but not limited to Phenoxyethanol, for a period of time was a violation of the Missouri Merchandising Practices Act, as further stated herein, and was a material omission.

126.    Defendant's failure to disclose the fact that the Products contain artificial ingredients including preservatives, sweeteners, flavors, or colors from artificial sources was a violation of the Missouri Merchandising Practice Act, and was a material omission.

127.    Plaintiff purchased the Products for personal, family, or household purposes.

128.    Plaintiff suffered an ascertainable loss as a result of Defendant's unlawful conduct because the actual value of the Products as purchased was less than the value of the Products as represented. In addition, the Products are legally worthless.


**COUNT IV**
**Violation of Missouri's Merchandising Practices Act, ("MMPA")**
**Half-Truths, 15 CSR 60-9.090**
**(As to the Missouri Subclass Only)**

129.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

130.    Plaintiff brings this Count individually and on behalf of the members of the Missouri Subclass.

131.    A half-truth misrepresentation as defined in the MMPA occurs when "any person in connection with the advertisement or sale of merchandise to omit to state a material fact necessary in order to make statements made, in light of the circumstances under which they are made, not misleading." 15 CSR 60-9.090.

132.    A "material fact" is defined as "any fact which a reasonable consumer would likely consider to be important in making a purchasing decision, or which would be likely to

induce a person to manifest his/her assent, or which the seller knows would be likely to induce a particular consumer to manifest his/her assent, or which would be likely to induce a reasonable consumer to act, respond or change his/her behavior in any substantial manner." 15 CSR 60-9.010(1)(C).

133.    "Omission of a material fact" is defined as "any failure by a person to disclose material facts known to him/her, or upon reasonable inquiry would be known to him/her." 15 CSR 60-9.110(3).

134.    Defendant's actions as alleged herein constitute the concealment and omission of material facts.

135.    Among other things, Defendant concealed and omitted the material facts that the Products were not "natural."

136.    As described further herein, the representation that a product is "natural" is a fact which may "induce a reasonable consumer to act, respond or change his/her behavior in any substantial manner."

137.    Defendant's labeling for the Products does not disclose that the Products contain synthetic ingredients.

138.    Defendant's labeling for the Products does not disclose which, if any, ingredients are synthetic.

139.    As described further herein, the presence or lack of synthetic chemicals in a product is a fact which may "induce a reasonable consumer to act, respond or change his/her behavior in any substantial manner."

140.    During the statutory period – by Defendant's own admission – it failed to disclose the presence of certain synthetic ingredients, including but not limited to Phenoxyethanol, on the Products' labels.

141.    As described further herein, the presence or lack of Phenoxyethanol in a product is a fact which may "induce a reasonable consumer to act, respond or change his/her behavior in any substantial manner."

142.    Defendant's failure to disclose certain the presence of certain synthetic ingredients, including but not limited to Phenoxyethanol, for a period of time was a violation of the Missouri Merchandising Practices Act, as further stated herein, and was a material omission.

143.    Defendant's failure to disclose the fact that the Products contain artificial ingredients including preservatives, sweeteners, flavors, or colors from artificial sources was a violation of the Missouri Merchandising Practice Act, and was a material omission.

144.    Plaintiff purchased the Products for personal, family, or household purposes.

145.    Plaintiff suffered an ascertainable loss as a result of Defendant's unlawful conduct because the actual value of the Products as purchased was less than the value of the Products as represented. In addition, the Products are legally worthless.

**COUNT V**
**Breach of Express Warranty**

146.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

147.    Plaintiff brings this claim individually and on behalf of the members of the proposed Classes against the Defendant.

148.     Defendant, as the designer, manufacturer, marketer, distributor, and/or seller, expressly warranted and represented that the Products are "natural" and "natural remedies."

149.     Defendant provided the Plaintiff and Class Members with an express warranty in the form of written affirmations of fact promising and representing that the Products are natural.

150.     The above affirmations of fact were not couched as "belief" or "opinion," and were not "generalized statements of quality not capable of proof or disproof."

151.     Defendant's express warranties, and its affirmations of fact and promises made to Plaintiff and Class Members regarding the Products, became part of the basis of the bargain between Defendant and Plaintiff and the Classes, thereby creating an express warranty that the Products would conform to those affirmations of fact, representations, promises, and descriptions.

152.     The Products do not conform to the express warranty because they contain ingredients that are unnatural and synthetic.

153.     Defendant was provided notice of these issues by numerous public complaints and inquiries concerning its use of synthetic ingredients in its products.

154.     Additionally, prior to the filing of this complaint, Plaintiff timely notified Defendant of these breaches by a letter sent via United States Postal Service Priority Mail on November 16, 2020. The letter was received by Defendant at 11:11AM on November 19, 2020.

155.     Defendant has had a reasonable opportunity to cure its breach of written warranties and any additional opportunity to cure would be unnecessary and futile.

156.     As a direct and proximate cause of Defendant's breach of express warranty, Plaintiff and members of the Classes have been injured and harmed because: (a) they would not have purchased the Products on the same terms if they knew the truth about the Products'

unnatural ingredients; (b) they paid a substantial price premium based on Defendant's express

warranties; and (c) the Products do not have the characteristics, uses, or benefits as promised.

## COUNT VI
## Unjust Enrichment

157.   Plaintiff repeats and realleges each and every allegation contained in the

foregoing paragraphs as if fully set forth herein.

158.   Plaintiff brings this claim individually and on behalf of the members of the

proposed Classes against the Defendant.

159.   At all times relevant hereto, Defendant deceptively marketed, advertised, and sold

merchandise to Plaintiff and the Classes.

160.   Plaintiff and members of the Classes conferred upon Defendant nongratuitous

payments for the Products that they would not have if not for Defendant's deceptive advertising

and marketing. Defendant accepted or retained the nongratuitous benefits conferred by Plaintiff

and members of the Classes, with full knowledge and awareness that, as a result of Defendant's

deception, Plaintiff and members of the Classes were not receiving a product of the quality,

nature, fitness, or value that had been represented by Defendant and reasonable consumers would

have expected.

161.   Defendant has been unjustly enriched in retaining the revenues derived from

Plaintiff's and Class Members' purchases of the Products. Retention of those monies under these

circumstances is unjust and inequitable because of Defendant's misrepresentations about the

Products, which caused injuries to Plaintiff and Class Members because they would not have

purchased the Products if the true facts had been known.

162.    Because Defendant's retention of the non-gratuitous benefits conferred on it by Plaintiff and members of the Classes is unjust and inequitable, Defendant must pay restitution to Plaintiff and members of the Classes for their unjust enrichment, as ordered by the Court.

## RELIEF DEMANDED

163.    WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

a.  For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as representative of the Classes and Plaintiff's attorneys as Class Counsel to represent the members of the Classes;

b.  For an order declaring the Defendant's conduct violates the statutes and laws referenced herein;

c.  For an order awarding, as appropriate, compensatory and monetary damages, restitution or disgorgement to Plaintiff and the Classes for all causes of action;

d.  For an order requiring Defendant to immediately cease and desist from selling their misbranded Products in violation of law; enjoining Defendant from continuing to label, market, advertise, distribute, and sell the Products in the unlawful manner described herein; and ordering Defendant to engage in corrective action;

e.  For prejudgment and postjudgment interest on all amounts awarded;

f.  For an order awarding punitive damages; and

g.  For an order awarding attorneys' fees and expenses and costs of suit.

## JURY DEMAND

Plaintiff demands a trial by jury on all causes of action and issues so triable.

Dated: November 27, 2020

Respectfully submitted,

/s/ Steffan T. Keeton
Steffan T. Keeton, Esq.
314635PA
(*pro hac vice* forthcoming)
stkeeton@keetonfirm.com

**The Keeton Firm LLC**
100 S Commons, Ste. 102
Pittsburgh, PA 15212
Phone: 1-888-412-5291

/s/ Michael A. Mills
Michael A. Mills, Esq.
14161000TX
(*pro hac vice* forthcoming)
mickey@millsmediation.com

**The Mills Law Firm**
8811 Gaylord Drive
Suite 200
Houston, TX 77024
Phone: (832) 548-4414
Fax: (832) 327-7443

*Attorneys for Plaintiff and the Class*